**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **NO. EP-22-CR-00773-DB** |
| **v.** | § | |
| | § | |
| **ADRIAN GIL, II,** | § | |
| | § | |
| **Defendant.** | § | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

TO THE HONORABLE JUDGE OF SAID COURT:

The government responds to Defendant's Motion to Withdraw His Guilty Plea and Dismiss Indictment as follows:

### PRELUDE

Because of the significance of the issue raised in Defendant's motion to dismiss the indictment and how any ruling by the Court would impact Defendant's motion to withdraw his plea, the government will not address the withdrawal issue other than to say, if the Court were to rule in the government's favor, the issue of withdrawal would be moot, Defendant having admitted to the elements of the offense and the factual basis under oath.

### INTRODUCTION

The dangers of mixing guns and drugs are well-known. *See, e.g.*, *United States v. Yancey*, 621 F.3d 681, 684–86 (7th Cir. 2010) (collecting "academic research confirm[ing] the connection between drug use and violent crime"). So, in 1968, Congress added illegal drug users and addicts to the list of people federally prohibited from possessing guns. *See Gun Control Act of 1968, Pub.*

L. 90-618, § 102, 82 Stat. 1213, 1220; 18 U.S.C. § 922(g)(3). Both before and after the Supreme

Court recognized the individual right to bear arms in *District of Columbia v. Heller*, 554 U.S. 570

(2008), the Fifth Circuit upheld § 922(g)(3) as consistent "with the right of Americans generally

to individually keep and bear their private arms as historically understood in this country." *United

States v. Patterson*, 431 F.3d 832, 835 (5th Cir. 2005); *see United States v. May*, 538 F. App'x 465,

466 (5th Cir. 2013); *United States v. Roach*, 201 F. App'x 969, 974 (5th Cir. 2006). Other circuits

uniformly agreed. *See, e.g.*, *United States v. Carter*, 750 F.3d 462, 466–68 (4th Cir. 2014); *United

States v. Dugan*, 657 F.3d 998, 999 (9th Cir. 2011); *Yancey*, 621 F.3d at 687; *United States v. Seay*,

620 F.3d 919, 925 (8th Cir. 2010); *United States v. Richard*, 350 F. App'x 252, 260 (10th Cir. 2009).

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the

Supreme Court "made the constitutional standard endorsed in *Heller* more explicit," *id.* at 2134.

The Court held that New York's sweeping public-carry ban, which yielded only to a licensing

regime entrusted to case-by-case executive discretion, violates the Second Amendment. In

overturning New York's law, the Court clarified that if the Second Amendment's plain text covers

the conduct at issue, then a law restricting the conduct must be consistent with the nation's

historical tradition of gun regulation.

Although *Bruen* clarified the framework applicable to Second Amendment claims, it did

not upset the applecart of federal gun regulation that has persisted for decades. Nor did the Court

retract its past assurances that the Constitution permits a range of narrow, status-based gun

restrictions meant to protect the community from people whose gun possession poses a risk.

Indeed, the Court insisted that its holding did not put legislatures in a "regulatory straitjacket."

Thus, the overwhelming majority of post-*Bruen* cases considering § 922(g)(3)—including

both cases from this district and all from this circuit—hold that it does not violate the Second

Amendment. *See United States v. Stennerson*, No. CR 22-139-BLG-SPW, 2023 WL 2214351 (D. Mont. Feb. 24, 2023); Order on Mot. to Dism., *United States v. Randall*, No. 4:22-cr-00099-SMR-HCA-3 (S.D. Iowa Feb. 14, 2023), ECF No. 129; *United States v. Posey*, No. 2:22-CR-83 JD, 2023 WL 1869095 (N.D. Ind. Feb. 9, 2023); *United States v. Lewis*, No. CR-22-368-F, 2023 WL 187582 (W.D. Okla. Jan. 13, 2023); *United States v. Black*, No. CR 22-133-01, 2023 WL 122920 (W.D. La. Jan. 6, 2023); *Gilpin v. United States*, No. 20-04050-01-CR-C-RK, 2023 WL 387049 (W.D. Mo. Jan. 3, 2023); Order Denying Mot. to Dism., *United States v. Beverly*, No. 2:21CR36 (KLEEH) (N.D. W. Va. Jan. 3, 3023), ECF No. 155; *United States v. Connelly*, No. EP-22-CR-229(2)-KC, 2022 WL 17829158 (W.D. Tex. Dec. 21, 2022); *United States v. Sanchez*, No. W-21-CR-00213-ADA, 2022 WL 17815116 (W.D. Tex. Dec. 19, 2022); *Fried v. Garland*, No. 4:22-CV-164-AW-MAF, 2022 WL 16731233 (N.D. Fla. Nov. 4, 2022); *United States v. Seiwert*, No. 20 CR 443, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022); Order Denying Mot. to Withdraw Plea & Dism. Indictment, *United States v. Veasley*, No. 4:20-cr-00209-RGE-HCA (S.D. Iowa Sept. 22, 2022), ECF No. 54; *United States v. Harper*, No. 21-CR-4085-LTS-KEM, 2022 WL 8288406 (N.D. Iowa Sept. 9, 2022); *United States v. Daniels*, No. 1:22-CR-58-LG-RHWR-1, 2022 WL 2654232 (S.D. Miss. July 8, 2022).[1]

These cases reach the correct result. The defendant's Second Amendment claim fails at both steps of *Bruen*'s framework. At *Bruen*'s first step, which asks whether the Second Amendment's plain text covers the conduct at issue, the defendant's claim fails because illegal drug users and addicts are, by definition, not "law-abiding" citizens covered by the amendment's text. At *Bruen*'s second step, the claim fails because disarming illegal drug users and addicts

---

[1] The sole contrary decision is therefore a stark outlier. *See United States v. Harrison*, No. CR-22-00328-PRW, 2023 WL 1771138 (W.D. Okla. Feb. 3, 2023). *Harrison* was wrongly decided for the reasons set forth below.

comfortably squares with the nation's historical tradition of gun regulation. This Court should deny the defendant's motion.

**STATEMENT OF THE CASE**

## I.      Statutory background

Section 922(g)(3) makes it unlawful for "any person … who is an unlawful user of or addicted to any controlled substance … to … possess in or affecting commerce[] any firearm or ammunition."

Federal law has embodied status-based criminal prohibitions on gun possession since 1938. That year, Congress passed the Federal Firearms Act, limiting gun access by people charged with or convicted of violent crimes. *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (noting that the "first federal statute disqualifying felons from possessing firearms was not enacted until 1938" (citing Federal Firearms Act of 1938, ch. 850, § 2(f), 52 Stat. 1250, 1251)). The Federal Firearms Act sought to protect the public by "eliminat[ing] the guns from the crooks' hands, while interfering as little as possible with the law-abiding citizen." S. Rep. No. 82, 75th Cong., 1st Sess. 2 (1937). Congress believed that the restricted classes of people had, "by their past conduct, … demonstrated their unfitness to be entrusted with such dangerous instrumentalities" as guns and ammunition. *Cases v. United States*, 131 F.2d 916, 921 (1st Cir. 1942).

In 1968, Congress passed the Gun Control Act, which expanded the federal restrictions on gun access. *See* Gun Control Act of 1968, Pub. L. 90-618, § 102, 82 Stat. 1213, 1220. That Act's purpose was "to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence"—but not "to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to" lawful purposes. *Id.* at 1213–14. Like the Federal Firearms Act, the Gun Control

Act was meant "to keep guns out of the hands of presumptively risky people." *Yancey*, 621 F.3d at 683 (citing *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 112 n.6 (1983)); *see also United States v. Laurent*, 861 F. Supp. 2d 71, 83 (E.D.N.Y. 2011) (cleaned up) (describing the Gun Control Act's legislative history and observing that it "reflects a concern with keeping firearms out of the hands of categories of potentially irresponsible person"). To that end, the Gun Control Act added both the mentally ill and illegal drug users and addicts to the list of people barred from having guns. Pub. L. 90-618, § 102, 82 Stat. 1213, 1220.

## II.    Factual and procedural background

On July 15, 2021, El Paso Police Department (EPPD) patrol units went to a house on Splendor Ct., El Paso, Texas, in response to a call alleging a fight involving a firearm. Upon arrival officers observed multiple people in the street in front of the house. The officers saw a male, later identified as Adrian Gil II, flee into the house.

Officers knocked on the door of the house and were able to see several individuals who were ordered out of the house. Located in plain view of the officers was a quantity of marihuana just inside the front door of the house. A protective sweep of the house was conducted and another bag of marijuana was found. All occupants were detained. Officers notified El Paso Police Department Narcotics Unit who responded to the scene for further investigation. The narcotics officers obtained a state narcotics search warrant for the house and executed it in early hours on July 16, 2021.

During the search multiple firearms were recovered and the EPPD narcotics officers requested assistance from agents of the Bureau of Alcohol Tobacco Firearms and Explosives (ATF). An ATF agent arrived at the house, was briefed on the facts and began to investigate to determine the facts as they relate to the firearms. The ATF agent spoke with the EPPD officers.

The ATF agent was told several people had been arrested, one of whom was Defendant Adrian Gil, II.  The ATF agent was made aware that several firearms were discovered during the search.

The arrested individuals were taken to the EPPD Pebble Hills Regional Command Center for processing.  The ATF agent and an EPPD officer conducted custodial interviews of all those arrested to determine if violations of federal firearms laws had been committed. Andres GIL II advised the ATF agent that all the firearms belonged to him and that he had purchased them from various individuals and that he had purchased one, the rifle, from the El Paso Gun Exchange.

Adrian GIL II admitted to being a daily user of marihuana since age 14.  The ATF agent determined, based on this information that Defendant GIL  was in violation of 18 USC 922(g)(3).

On The ATF agent asked Defendant GIl, if he knew it was a federal offense to be a drug user in possession of a firearm.  GIL said, "trap trap you got me".  GIL said he knew it was illegal to have a marihuana medical card from New Mexico and have a firearm. GIL told the ATF agent marihuana helped him eat more and said, "I just like good weed".

On June 1, 2022, a federal grand jury returned an indictment charging Defendant Gill under Title 18 U.S.C. §§ 922(g)(3) and 924(a)(2), a Drug User in Possession of a Firearm.  On November 10, 2022, Defendant Gil pleaded guilty to the indictment.  Sentencing was set for February 16, 2023.  At sentencing the Court, based on the Fifth Circuit's decision in *United States v. Rahimi,* 59 F.4th 163 (5th Cir. 2023) and the Supreme Court decision in *New York State Rifle and Pistol Association, Inc. v. Bruen,* ___ U. S. ___, 142 S.Ct. 2111 (2022), continued the sentencing to allow for briefing on the issues raised in those decisions.

## Legal Standard

The defendant asserts a facial challenge to § 922(g)(3). Facial challenges "should be granted sparingly and only as a last resort." *United States v. McGinnis*, 956 F.3d 747, 752–53 (5th

Cir. 2020). A party bringing a facial challenge can succeed only "by 'establishing that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (brackets omitted). "[F]acial challenges are best when infrequent." *Sabri v. United States*, 541 U.S. 600, 608 (2004). "Although passing on the validity of a law wholesale may be efficient in the abstract, any gain is often offset by losing the lessons taught by the particular, to which common law method normally looks." *Id.* at 608–09.

"Facial challenges are disfavored for several reasons." *Washington State Grange*, 552 U.S. at 450. First, facial challenges "often rest on speculation" and so "raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.'" *Id.* (quoting *Sabri*, 541 U.S. at 609). Second, facial challenges "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* (quotation marks omitted). Third, "facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at 451.

**ARGUMENT**

**I.    The Second Amendment's plain text does not cover illegal drug users and addicts.**

The Second Amendment codified a preexisting understanding of the right to bear arms as covering only law-abiding, responsible citizens. Illegal drug users and addicts are, by definition, not law-aiding citizens. Thus, § 922(g)(3) burdens no conduct covered by the Second Amendment's plain text.

### A. The Second Amendment's text codified a preexisting right that covered only law-abiding citizens.

The Second Amendment does not cover all citizens. "[T]he Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right," neither "granted by the Constitution" nor "dependent upon that instrument for its existence." *Heller*, 554 U.S. at 592; *see also id.* at 599 (explaining that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.'" (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). So the right to bear arms is "enshrined with the scope [it was] understood to have when the people adopted [it]." *Id.* at 634–35.

"The founders understood that not everyone possessed Second Amendment rights." *Range v. Att'y Gen.*, 53 F.4th 262, 271 (3d Cir. 2022) (brackets omitted), *reh'g en banc granted, opinion vacated sub nom.*, 56 F.4th 992 (3d Cir. 2023).[2] To the contrary, "the history of the 'pre-existing right' of 'the people' to 'keep and bear arms,' codified in the Second Amendment, demonstrates that the Second Amendment right extended, and continues to extend, 'to some categories of individuals, but not others.'" *United States v. DaSilva*, No. 3:21-CR-267, 2022 WL 17242870, at *7 (M.D. Penn. Nov. 23, 2022) (quoting *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1044 (11th Cir. 2022)). So "even individuals who are indisputably part of 'the people' … might not partake of that pre-existing right and, therefore, may be prohibited from possessing firearms without offending the Second Amendment." *Id.* (quoting *Jimenez-Shilon*, 34 F.4th at 1045–46).

---

[2] Although the Third Circuit has granted rehearing en banc and vacated the panel opinion in *Range*, the government cites it for its persuasive value and historical analysis, as many courts have done since it was vacated. *See, e.g.*, *United States v. Rahimi*, --- F. 4th ----, 2023 WL 2317796, at *4–5 (5th Cir. Mar. 2, 2023).

*Heller* explained that the preexisting right to bear arms was "not unlimited," *see* 554 U.S. at 626, but that the Second Amendment codified a "right of law-abiding, responsible citizens," *see id.* at 635. The Court identified a non-exhaustive list of "presumptively lawful regulatory measures," including the "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 626–27 & n.26; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (repeating *Heller*'s "assurances" about restrictions on felons and the mentally ill). Gun restrictions on felons and the mentally ill are presumptively lawful because those groups of people have demonstrated that they are not law-abiding, responsible citizens and are therefore not protected by the Second Amendment's plain text.

*Bruen* confirmed this reading of *Heller*. Echoing *Heller*, the Court explicitly, repeatedly described the Second Amendment right as belonging only to law-abiding citizens. *See, e.g.*, *Bruen*, 142 S. Ct. at 2122 (stating that *Heller* "recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense"); *id.* at 2131 (quoting *Heller*'s statement that the Second Amendment protects "'the right of law-abiding, responsible citizens to use arms' for self-defense"); *id.* at 2133 (stating that the historical inquiry should consider "how and why the regulations burden a law-abiding citizen's right to armed self-defense"); *id.* at 2156 (holding that New York's licensing law violates the Second Amendment because "it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms"); *see also Range*, 53 F.4th at 271 (noting that "the [*Bruen*] majority characterized the holders of Second Amendment rights as 'law-abiding' citizens no fewer than fourteen times"). None of those references suggest that the Second Amendment curbs laws restricting the gun rights of non-law-abiding citizens.

Three more aspects of the *Bruen* opinion further confirm that a person's status as non-law-abiding counts at its first, textual step:

First, the *Bruen* opinion itself addressed whether the petitioners were law-abiding citizens in the section (III.A) addressing the Second Amendment's textual scope, not the section (III.B) addressing historical tradition. *See* 142 S. Ct. at 2134. The Court observed that the parties did not dispute "that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects." *Id.* (citing *Heller*, 554 U.S. at 580). The Court thus implied that the Second Amendment covered them *because* they were undisputedly law-abiding, responsible citizens.

Second, *Bruen* (along with *Heller*) set contrary presumptions depending on whether a law prevents law-abiding citizens from bearing arms. As noted, *Heller* established that laws disarming "felons and the mentally ill"—and some other gun regulations—are "presumptively lawful." 554 U.S. at 626 & n.26. In contrast, *Bruen* held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," so that laws prohibiting the conduct are presumptively *unlawful*. 142 S. Ct. at 2126. *Bruen*'s presumptive protection could be "[i]n keeping with" *Heller*'s presumptive lawfulness, *see id.*, only if *Heller*'s "presumptively lawful" regulations burden no conduct covered by the amendment's text. In other words, at least some status-based restrictions of people considered non-law-abiding or irresponsible—"felons and the mentally ill"—are "presumptively lawful" *because* the Second Amendment's text excludes those people.

Third, *Bruen* explained that its opinion should not "be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes," which "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right." 142

S. Ct. at 2138 n.9 (citing *Heller*, 554 U.S. at 635); *see also id.* at 2161 (Kavanaugh, J. concurring) ("[T]he 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so."). Those regimes require background checks and set "narrow, objective, and definite standards" meant to ensure "that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Id.* at 2138 n.9 (quotation marks omitted). And many states' standards exclude from eligibility applicants who would qualify as illegal drug users or addicts under § 922(g)(3)'s standard. *See, e.g.*, Ohio Rev. Code § 2923.125(o) (requiring the application to "certify that [he] is not an unlawful user of or addicted to any controlled substance as defined in 21 U.S.C. 802.); Ark. Code § 5-73-309(7)(A) (requiring that the applicant "[d]oes not chronically or habitually abuse a controlled substance to the extent that his or her normal faculties are impaired"); Miss. Code. § 45-9-101(e) (same). By indicating that those regimes remain broadly constitutional (unless abused, as when "lengthy wait times … or exorbitant fees deny ordinary citizens their right to public carry"), the Court implied that the Second Amendment's text excludes people (like drug users and addicts) considered non-law-abiding. Otherwise, the 43 states' many objective criteria disqualifying applicants for licenses—and thus preventing them from bearing arms—could survive only through case-by-case, historical inquiries. The Court suggested no such thing.[3]

In *Bruen*'s wake, "[t]he majority of courts have concluded that the [Second Amendment] right extends only to law-abiding citizens." *Black*, 2023 WL 122920, at *3 (collecting cases). In rejecting a challenge to § 922(g)(1)'s prohibition of gun possession by convicted felons, for instance, the Third Circuit panel opinion in *Range* (now vacated pending en banc review)

---

[3] The breadth and variability of objective criteria applied by the 43 shall-issue states was not lost on the Court, which collected citations to all the licensing regimes and described how some work. *See Bruen*, 142 S. Ct. at 2123 n.1.

explained that "[t]hose whose criminal records evince disrespect for the law are outside the community of law-abiding citizens entitled to keep and bear arms." *Range*, 53 F.4th at 273. The court "[i]nterpret[ed] the text of the Second Amendment in light of the right's 'historical background,'" *id.* at 282 (quoting *Bruen*, 142 S. Ct. at 2127), surveying historical status-based gun laws from 1600s England through the amendment's ratification, *see id.* at 274–81. It held that the Second Amendment's scope "properly excludes those who have demonstrated disregard for the rule of law through the commission of felony and felony-equivalent offenses, whether or not those crimes are violent." *Id.* at 266.[4]

Some courts held the same before *Bruen* in textual analyses that *Bruen* deemed "broadly consistent" with Supreme Court precedent. *See* 142 S. Ct. 2127. Like *Range*, *Medina v. Whitaker*

---

[4] Many district courts have likewise rejected post-*Bruen* challenges to status-based gun laws on the ground that the restricted people are not law-abiding, responsible citizens whom the Second Amendment covers. *See, e.g.*, *Battles v. United States*, No. 4:23-CV-00063-HEA, 2023 WL 346002, at *1 (E.D. Mo. Jan. 20, 2023) ("*Bruen* confines its holding to the context of regulations that 'burden a *law-abiding citizen's* right to armed self defense."); *United States v. Medrano*, No. 3:21-CR-39, 2023 WL 122650, at *1–2 (N.D.W. Va. Jan. 6, 2023) (noting that *Bruen*'s "rationale is firmly built upon its chosen 'law-abiding' language, which appears throughout," and holding that "the reach of *Bruen* ends at the feet of those individuals who are not law-abiding citizens"); *Sanchez*, 2022 WL 17815116, at *1 ("The Supreme Court has held that the right to bear arms is limited to 'law-abiding, responsible citizens.'"); *United States v. Hunter*, No. 1:22-CR-84-RDP-NAD-1, 2022 WL 17640254, at *6 (N.D. Ala. Dec. 13, 2022) (noting the language in *Bruen* "limiting the scope of the Second Amendment right to 'law abiding' citizens"); *United States v. Fencl*, No. 21-CR-3101 JLS, 2022 WL 17486363, at *2 (S.D. Cal. Dec. 7, 2022) (holding that an indicted defendant on pretrial release fell "outside the scope of [the Second Amendment's] protections as he has been charged with unlawful possession of firearms based on a finding of probable cause"); *United States v. Grinage*, No. SA-21-CR-00399-JKP, 2022 WL 17420390, at *5 (W.D. Tex. Dec. 5, 2022) (explaining that *Heller* and *Bruen* "lead[] the Court to conclude convicted felons like Grinage are not included in 'the people' protected by the Second Amendment"); *United States v. Young*, No. CR 22-054, 2022 WL 16829260, at *7 (W.D. Pa. Nov. 7, 2022) ("*Bruen*, *Heller* and *McDonald* dictate that Defendant's alleged conduct does not fall within the scope of the Second Amendment's protections due to his felony drug convictions."); *United States v. Grant*, No. CR 3:22-161-MGL-1, 2022 WL 16541138, at *3 (D.S.C. Oct. 28, 2022) ("By distinguishing non-law-abiding citizens from law-abiding ones, the dicta in *Heller* and *McDonald* clarifies the bounds of the plain text of the Second Amendment.").

rejected a challenge to § 922(g)(1) as applied to a nonviolent felon. 913 F.3d 152, 157–58 (D.C. Cir. 2019). To determine "the public understanding of the right" when the Second Amendment was ratified, the Court considered the severe punishments felons then faced, as well as evidence that the founders understood the right to exclude "those who were not (or could not be) virtuous members of the community." *Id.* at 158–59. The court held that felons—violent or not—"are not among the law-abiding, responsible citizens entitled to the protections of the Second Amendment." *Id.* at 154; *accord United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (holding that "felons are categorically different from the individuals who have a fundamental right to bear arms").

The panel decision in *United States v. Rahimi* does not compel a contrary conclusion. *See* No. --- F.4th ----, 2023 WL 2317796 (5th Cir. Mar. 2, 2023). For one thing, the government maintains that *Rahimi* was wrongly decided, in part because the panel did not adopt the government's argument that persons subject to qualifying domestic-violence restraining orders fall outside the scope of the Second Amendment's plain text. *Id.* at *4–5. Contrary to *Rahimi*'s holding, and as set forth above, *Heller* and *Bruen* recognized a substantive limit on the Second Amendment's scope by repeatedly describing the holders of the right as "law-abiding." The Attorney General has announced that the government will seek further review of the panel's decision. *See* Dep't of Justice, Statement from Attorney General Merrick B. Garland Regarding *United States v. Rahimi* (Feb. 2, 2023), https://www.justice.gov/opa/pr/statement-attorney-general-merrick-b-garland-regarding-united-states-v-rahimi.

Regardless, what *Rahimi* held as to persons subject to domestic-violence orders does not apply to illegal drug users and addicts. *Rahimi* reasoned that the Second Amendment covers persons subject to civil orders because they do not constitute a "group[] whose disarmament the

Founders 'presumptively' tolerated or would have tolerated." *Id.* at \*4 (quoting *Heller*, 554 U.S. at 527 n.26). But the panel recognized that being a convicted felon or member of another group subject to "longstanding prohibition[s] on the possession of firearms" could exclude a person "from the political community within the amendment's scope." *Id.* at \*5. Because unlawful drug users and addicts are, by definition, non-law-abiding citizens who were not historically understood to enjoy unfettered gun rights, as set forth below, they are properly excluded from the Second Amendment's textual scope.

### B.  Illegal drug users and addicts are, by definition, not law-abiding citizens covered by the Second Amendment's text.

Anyone who violates § 922(g)(3) is, by definition, a person habitually engaged in "unlawful" conduct and is therefore not a law-abiding, responsible citizen covered by the Second Amendment. The Supreme Court has not precisely defined the community of law-abiding, responsible citizens who enjoy the right to bear arms. It has given no indication, however, that only a felony *conviction* establishes that a person is non-law-abiding. Instead, the Court repeatedly deployed "its chosen 'law-abiding' language" in both *Heller* and *Bruen*. *See Medrano*, 2023 WL 122650, at \*1. *Heller*, moreover, identified "felons and the mentally ill" as merely items on a *non*-exhaustive list of people excluded from the Second Amendment's scope. *See* 554 U.S. at 626–27 & n.26. Had the Court meant to require a criminal conviction to negate a citizen's status as law-abiding, it could easily have said so. Thus, applying *Heller* and *Bruen*, courts have defined the excluded people more broadly. For instance, in upholding § 922(g)(1), *Range* explained that the Second Amendment excludes those "whose actions demonstrated a disrespect for the rule of law as embodied in the sovereign's binding norms," leaving legislatures "discretion to determine when individuals' status or conduct evinced such a threat sufficient to warrant disarmament." *Range*, 53 F.4th at 280–81.

A decision from this district reasoned similarly to reject a Second Amendment challenge to § 922(g)(3). *See Sanchez*, 2022 WL 17815116, at \*1–3. *Sanchez* recognized that *Bruen*'s majority "consistently explains that the holders of Second Amendment rights are 'law-abiding' citizens." *Id.* at \*3. As additional support for that reading of *Bruen*, the court cited *Bruen*'s discussion of shall-issue licensing regimes, which *Bruen* indicated are constitutional without "need[ing] to conduct a detailed historical analysis … , showing that they are supported by the plain text of the amendment." *Id.* "Following this analysis," the court upheld § 922(g)(3) at *Bruen*'s first, textual step because it "limits only persons that are not law-abiding from obtaining firearms and thus does not cover conduct protected by the Second Amendment." *Id.*; *see also Seiwert*, 2022 WL 4534605, at \*2 (agreeing with the government that unlawful drug users and addicts "are not, by definition, law-abiding citizens" and so "fall outside the Second Amendment's protection"); Order on Mot. to Dism. at 6, *Randall*, No. 4:22-cr-00099-SMR-HCA-3 ("There are classes of individuals charged under the statute who are not entitled to the Second Amendment's protection. This means 18 U.S.C. § 922(g)(3) criminalizes conduct not protected by the Second Amendment.")[5]

## II.     Section 922(g)(3) squares with the nation's historical tradition of gun regulation.

Even if the Second Amendment covers indicted defendants, § 922(g)(3) is consistent with the right to bear arms because it squares with historical tradition. When comparing modern and historical gun laws, courts must often "reason[] by analogy," which "requires a determination of

---

[5] Other courts have suggested that drug users and addicts subject to § 922(g)(3) fall outside the Second Amendment's textual scope but have assumed otherwise, without deciding the issue, because § 922(g)(3) is constitutional at *Bruen*'s second, historical-tradition step regardless. *See, e.g.*, *Fried*, 2022 WL 16731233, at \*5 (stating that it is "difficult to dismiss the idea that *non*-law-abiding citizens have no Second Amendment rights"); *Daniels*, 2022 WL 2654232, at \*2 (stating that "there is some doubt that section 922(g)(3) is textually covered" since drug users are not law-abiding); *Black*, 2023 WL 122920, at \*3; *Posey*, 2023 WL 1869095, at \*6.

whether the two regulations are relevantly similar." *Bruen*, 142 S. Ct. at 2132 (quotation marks omitted). *Bruen* gave no "exhaustive survey of the features that render regulations relevantly similar" but noted "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33. In other words, the central inquiry is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133.

"[A]nalogical reasoning," the Court continued, is not "a regulatory straitjacket." *Id.* at 2133. It "requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Id.*; *see also Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012) ("*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue."). "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133.

*Bruen*'s guidance forecloses simply "comparing the modern law under review with the laws of a couple of centuries ago, like a redline comparison in a word processing application." *United States v. Kelly*, No. 3:22-CR-00037, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022). That is "because a list of the laws that *happened to exist* in the founding era is, as a matter of basic logic, not the same thing as an exhaustive account of what laws would have been theoretically *believed to be permissible* by an individual sharing the original public understanding of the Constitution." *Id.* A court conducting *Bruen*'s historical inquiry must not only "consider what earlier legislatures did, but imagine what they could have imagined." *Id.*; *see also Lewis*, 2023 WL 187582, at *4 (considering how "a colonial legislature would have" assessed "the hazard presented by an armed habitual user of illegal drugs"); *United States v. Nutter*, No. 2:21-CR-00142, 2022

WL 3718518, at *5 (S.D.W. Va. Aug. 29, 2022) (framing the "core question" as "whether the prohibition at issue *would have been viewed* as consistent with the Second Amendment in the founding era" (emphasis added)).

Finally, *Bruen*'s historical inquiry does not split into (1) a "straightforward" approach for laws "address[ing] a general societal problem that has persisted since the 18th century," which requires a "distinctly similar" historical law; and (2) "a more nuanced approach" for laws addressing "unprecedented societal concerns," which calls for analogical reasoning. The court did not discuss those concepts in absolute or mandatory terms. It merely offered guidance on how courts "may" approach cases depending on their context. *See id.* at 2132. It used the phrase "distinctly similar" only once, and even then described "the lack of a distinctly similar historical regulation" only as "relevant evidence"—not as dispositive. *See id.* at 2131. *Bruen* itself considered a law addressing a persistent problem, *id.* at 2131–32, but still scoured centuries of English and American history for relevantly similar analogues, *see id.* at 2135–56. Courts making the historical-tradition inquiry have thus recognized that they can take both "straightforward" and other approaches to the *same case* as needed. *See, e.g.*, *United States v. Charles*, No. MO:22-CR-00154-DC, 2022 WL 4913900, at *4 (W.D. Tex. Oct. 3, 2022) ("With the straightforward historical inquiry unclear, a more nuanced approached is necessary.").

Two distinct historical threads sustain § 922(g)(3)'s restriction on illegal drug users and addicts: (1) historical restrictions on the intoxicated; and (2) historical laws restricting the gun rights of dangerous people. Both of types of laws have repeatedly been held sufficient in *Bruen*'s wake to establish a tradition supporting § 922(g)(3). *See* Order on Mot. to Dism. at 6–7, *Randall*, No. 4:22-cr-00099-SMR-HCA-3; *Posey*, 2023 WL 1869095, at *6–7; *Lewis*, 2023 WL 187582, at *4; *Black*, 2023 WL 122920, at *3–4; *Sanchez*, 2022 WL 17815116, at *3–4; *Fried*, 2022 WL

16731233, at *5–8; *Seiwert*, 2022 WL 4534605, at *2; Order Denying Mot. to Withdraw Plea &

Dism. Indictment at 3–4, *Veasley*, No. 4:20-cr-00209-RGE-HCA; *Daniels*, 2022 WL 2654232, at

*3–4. This Court should hold the same.

### A.  Section 922(g)(3) is analogous to historical laws disarming the intoxicated.

Longstanding historical tradition views intoxication as a condition rendering firearm

possession dangerous, and accordingly restricting the firearms rights of those who become

intoxicated. Colonial legislatures in two of the most populous colonies "recognized that guns and

alcohol were a bad combination." *Lewis*, 2023 WL 187582, at *4 n.5. In 1655, Virginia prohibited

"shoot[ing] any gunns at drinkeing." Act XII of March 10, 1655, 1655 Va. Laws 401, 401–02. In

1771, New York prohibited firing guns during the New Year's holiday, a restriction that "was aimed

at preventing the 'great Damages ... frequently done on [those days] by persons … being often

intoxicated with Liquor.'" *Heller*, 554 U.S. at 632 (quoting Ch. 1501, 5 Colonial Laws of New

York 244–46 (1894)).

In the era following ratification of the Fourteenth Amendment in 1868, which extended the

Second Amendment to the states, many states enacted statutes prohibiting intoxicated persons from

possessing, using, or receiving firearms. *See, e.g.*, Kansas Gen. Stat., Crimes & Punishments § 282

(1868) (providing that "any person under the influence of intoxicating drink" may not "carr[y] on

his person a pistol … or other dangerous weapon"); 1878 Miss. Laws 175–76 § 2 (making it

unlawful to sell pistols and certain knives to a "person intoxicated"); 1883 Mo. Laws 76, § 1

(prohibiting carrying a dangerous weapon "when intoxicated"); 1883 Wis. Sess. Laws 290,

Offenses Against Lives and Persons of Individuals, ch. 329 § 3 ("It shall be unlawful for any person

in a state of intoxication, to go armed with any pistol or revolver."); 1890 Okla. Sess. Laws 495,

art. 47, § 4 (officers may not "carry[] … arms while under the influence of intoxicating drinks");

1899 S.C. Acts 97, No. 67, § 1 (forbidding "boisterous conduct" while "under the influence of intoxicating liquors," including "discharg[ing] any gun" near a public road); *see also State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886) (upholding Missouri statute as "a reasonable regulation of the use of such arms"). The historical tradition embodied by these laws continues today, with most states "restrict[ing] the right of habitual drug abusers or alcoholics to possess or carry firearms." *Yancey*, 621 F.3d at 684 (collecting statutes).

Section 922(g)(3) is analogous to these historical laws under the two metrics offered by *Bruen*. First, "[t]he manner in which the modern restriction burdens Second Amendment rights is comparable to how the intoxication statutes burdened those rights." *Fried*, 2022 WL 16731233, at *7. The historical laws temporarily restricted a person's gun rights only "while impaired"; § 922(g)(3) similarly applies only while a person is "an active drug user." *Id.* "[U]nlawful drug users can regain their Second Amendment rights by simply ending their drug use." *Id.* Second, "[t]he burdens that the challenged regulation and the historical restrictions placed on individuals' Second Amendment rights are also comparably justified." *Id.* at *8. Both the historical laws and § 922(g)(3) "flow from the historical tradition of keeping guns from those in whose hands they could be dangerous." *Id.* at *8; *see also Posey*, 2023 WL 1869095, at *9 ("The historical record shows a tradition of regulating firearm possession by individuals using intoxicating substances which is analogous to § 922(g)(3)."); *Lewis*, 2023 WL 187582, at *4 ("The court concludes that § 922(g)(3) is relevantly similar to regulations aimed at preventing dangerous or untrustworthy persons from possessing and using firearms, such as individuals convicted of felonies or suffering from mental illness, or individuals who are intoxicated." (quotation marks omitted)); *Daniels*, 2022 WL 2654232, at *4 (upholding § 922(g)(3) because "analogous statutes which purport to disarm

persons considered a risk to society—whether felons or alcoholics—were known to the American legal tradition" (citing *Yancey*, 621 F.3d at 683)).

### B. Section 922(g)(3) is analogous to historical laws disarming presumptively dangerous groups of people.

In addition, § 922(g)(3) is analogous to the historical tradition of laws disarming dangerous or untrustworthy people more generally. English and American governments have long restricted some people's gun rights to promote public safety. "[B]y the time of American independence, England had established a well-practiced tradition of disarming dangerous persons—violent persons and disaffected persons perceived as threatening to the crown." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 261 (2020); *see id.* at 259–61 (detailing history).

The American colonies inherited that tradition. "The historical record shows that gun safety regulation was commonplace in the colonies, and around the time of the founding, a variety of gun safety regulations were on the books." *Nat'l Rifle*, 700 F.3d at 200.[6] The colonies (and later the states) passed laws that "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*, 142 S. Ct. at 2145. Those statutes "all but codified the existing common law in this regard." *Id.* at 2144 n.14 (citing George Webb, The Office and Authority of a Justice of Peace 92 (1736)). Before the ratification of the Second Amendment in 1791, at least four colonies

---

[6] *Bruen* abrogated *National Rifle*'s application of means-end scrutiny to the Second Amendment. *See* 142 S. Ct. at 2127 n.4. But this Court was "inclined to uphold the challenged federal laws at step one of [its pre-*Bruen*] analytical framework," *see Nat'l Rifle*, 700 F.3d at 204, which relied on text and history and was "broadly consistent with *Heller*," *see Bruen*, 142 S. Ct. at 2127. Nothing in *Bruen* abrogates this Court's or other courts' textual or historical analyses at "step one" of their pre-*Bruen* frameworks. *See United States v. Grinage*, No. SA-21-CR-00399-JKP, 2022 WL 17420390, at *2 (W.D. Tex. Dec. 5, 2022) ("[T]o the extent pre-*Bruen* cases relied on textual and historical analysis to find firearms restrictions constitutional, those cases are still good law.").

or states had codified the common-law prohibition on going armed offensively and authorized the arrest of those who did so. *See* 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 52–53 (1869) (1692 statute); Acts and Laws of His Majesty's Province of New Hampshire in New England; with Sundry Acts of Parliament 17 (1771) (1701 statute); 1 Laws of the State of North Carolina, including the Titles of Such Statutes and Parts of Statutes of Great Britain as Are in Force in Said State 131–32 (1821) (1741 statute); Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force 33 (1794) (1786 statute). Three of those statutes (all but North Carolina) required forfeiture of the offender's weapons. Other states soon followed. *See, e.g.*, A Compilation of the Statutes of Tennessee of a General and Permanent Nature, from the Commencement of the Government to the Present Time 99–100 (1836) (1801 statute).

Also "noteworthy" among "revolutionary and founding-era gun regulations are those that targeted particular groups for public safety reasons." *Nat'l Rifle*, 700 F.3d at 200. "The earliest firearm legislation in colonial America prohibited Native Americans, Black people, and indentured servants from owning firearms." *Range*, 53 F.4th at 276.[7] And, as the English Parliament had done after the Glorious Revolution, some colonies passed laws disarming Catholics who refused "to take oaths recognizing the legal authority of the Crown, rather than the Pope, over matters of religion." *Id.* at 277. Protestant majorities in those colonies disarmed Catholics because they "viewed Catholics as defying sovereign authority and communal values." *Id.*

---

[7] As *Range* observed, these laws are repugnant and would be unconstitutional today; yet they show that "legislatures had the power and discretion to use status as a basis for disarmament, and … that status-based bans did not historically distinguish between violent and non-violent members of disarmed groups." 53 F.4th at 276 n.18.

During the revolutionary war, "several jurisdictions passed laws that confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation." *Nat'l Rifle*, 700 F.3d at 200. In *Range*, the Third Circuit described several such laws, including a 1774 Connecticut law and 1777 laws passed by Pennsylvania and Virginia. 53 F.4th at 278–79; *see also Medina*, 913 F.3d at 159 (explaining that "during the revolution, the states of Massachusetts and Pennsylvania confiscated weapons belonging to those who would not swear loyalty to the United States"); Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157–60 (2007); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506–08 (2004); Joyce Lee Malcolm, To Keep and Bear Arms 140–41 (1994). Like laws disarming Catholics, these oaths laws disarmed not just violent individuals but also those who demonstrated "disrespect for the rule of law and the norms of the civic community." *Range*, 53 F.4th at 279 (citing Churchill, *Gun Regulation*, 25 Law & Hist. Rev. at 158).

Accounts of the ratification debates confirm the founders' belief that "disarming select groups for the sake of public safety was compatible with the right to arms specifically and with the idea of liberty generally." *Nat'l Rifle*, 700 F.3d at 200. "*Heller* identified … as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quoting 554 U.S. at 604); *see also Range*, 53 F.4th at 280. That report recognized that the government could disarm potentially dangerous or untrustworthy people, stating that "citizens have a personal right to bear arms 'unless for *crimes committed, or real danger of public injury*.'" *Id.* (emphasis added) (quoting 2 Bernard Schwarz,

The Bill of Rights: A Documentary History 662, 665 (1971)). Similarly, Samuel Adams offered an amendment at the Massachusetts convention to ratify the Constitution recommending "that the said Constitution be never construed to authorize Congress … to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." Schwarz, The Bill of Rights 674–75, 681 (emphasis added). Thomas Cooley's 1868 treatise, which *Heller* described as "massively popular," 554 U.S. at 616, later explained that some groups were "almost universally excluded" from exercising certain civic rights like gun rights, including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 29 (1st ed. 1868).

"[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010) (per curiam) (quoting *Vongxay*, 594 F.3d at 1118 (collecting scholarly sources)); *Carpio-Leon*, 701 F.3d at 979–80 (same). The Second Amendment thus incorporates "a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible" and "'does not preclude laws disarming the unvirtuous (i.e. criminals).'" *Bena*, 664 F.3d at 1183–84 (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986)); *see also United States v. Rene E.*, 583 F.3d 8, 15–16 (1st Cir. 2009) ("Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as … limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." (quoting Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002))).

The tradition of disarming dangerous or untrustworthy people supports § 922(g)(3)'s restriction on illegal drug users and addicts. It gives legislatures "both authority and broad discretion to determine when individuals' status or conduct evince[s] such a threat sufficient to warrant disarmament." *Range*, 53 F.4th at 282. It therefore supports gun restrictions on not just convicted felons or violent people, but also others deemed dangerous untrustworthy to obey the law. *See id.* "[I]n passing § 922(g)(3), Congress expressed its intention to keep firearms out of the possession of drug abusers, a dangerous class of individuals." *Seay*, 620 F.3d at 925. And one can hardly question Congress's judgment that unlawful drug abusers are, as a class, presumptively dangerous. *See, e.g.*, *Carter*, 750 F.3d at 467–69 (discussing empirical data tying drugs to gun violence); *Yancey*, 621 F.3d at 685–86 (explaining that habitual drug users "are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms" and noting that "[a]mple academic research confirms the connection between drugs and violent crime"). Section 922(g)(3) thus reflects a permissible legislative judgment consistent with historical tradition. Even still, its *temporary* prohibition on possession imposes a far lesser burden than the permanent ban on possession by other groups, like convicted felons. *See Yancey*, 621 F.3d at 686–87.

Both before and since *Bruen*, courts have described § 922(g)(3)'s prohibition as consistent with this longstanding tradition. For instance, although the Eighth Circuit ultimately relied in part on a means-end inquiry that *Bruen* abrogated, it also found "that § 922(g)(3) is the type of longstanding prohibition on the possession of firearms that *Heller* declared presumptively lawful." *Seay*, 620 F.3d at 925 (cleaned up). Similarly, in rejecting a Second Amendment challenge to § 922(g)(3), the Seventh Circuit explained that widespread restrictions on the gun rights of habitual drug users and alcoholics "are merely the latest incarnation of the states' unbroken history of

regulating the possession and use of firearms dating back to the time of the amendment's ratification." *Yancy*, 621 F.3d at 686. Those courts' historical analyses survive *Bruen*. *See United States v. Grinage*, No. SA-21-CR-00399-JKP, 2022 WL 17420390, at *2 (W.D. Tex. Dec. 5, 2022) ("[T]o the extent pre-*Bruen* cases relied on textual and historical analysis to find firearms restrictions constitutional, those cases are still good law.").

Post-*Bruen* decisions have likewise upheld § 922(g)(3) based on the tradition of disarming dangerous people. A decision from this district observed that § 922(g)(3) "has been continuously upheld as an exception to the Second Amendment right which is not inconsistent with the right of Americans generally to individually keep and bear their private arms as historically understood in this country." *Sanchez*, 2022 WL 17815116, at *3 (quotation marks omitted) (collecting cases). Pointing to "statutes which purport to disarm persons considered a risk to society," the court, "like those before it, [found] that the government ha[d] satisfied its burden of demonstrating that [§ 922(g)(3)] is consistent with the Nation's historical tradition of firearm regulation." *Id.*; *see also Seiwert*, 2022 WL 4534605, at *2 (upholding 922(g)(3) based on historical "regulations aimed at preventing dangerous or untrustworthy persons from possessing and using firearms, such as individuals convicted of felonies or suffering from mental illness"); *Fried*, 2022 WL 16731233, at *7 (upholding 922(g)(3) based on historical laws "keeping guns from those acting unlawfully"); *Posey*, 2023 WL 1869095, at *9 ("In the alternative, the Court would also uphold § 922(g)(3) as it is analogous to historical regulations preventing dangerous persons, such as felons and the mentally ill, from possessing firearms."); *Black*, 2023 WL 122920, at *3–4; *Lewis*, 2023 WL 187582, at *4.

*Rahimi* does not defeat the analogy between § 922(3)(3) and historical law addressing dangerous or untrustworthy people. The panel there concluded that § 922(g)(8) is not relevantly

similar to those laws "because out of the gate, *why* they disarmed people was different." *Rahimi*, 2023 WL 2317796, at \*9. According to the panel, those laws' purpose was to preserve "political and social order," not to protect "an identified person from the specific threat posed by another." *Id.* Although the government believes those distinctions should not have mattered in *Rahimi*, § 922(g)(3) is more like historical "dangerousness" laws in this respect. *See Posey*, 2023 WL 1869095, at \*9 n.7. As *Posey* explained, *Rahimi* "actually endorsed" laws protecting society generally, as opposed to a specific victim, "as consistent with the historical record." *Id.* Because § 922(3)(3) resembles historical laws protecting society generally, "the findings in *Rahimi* support the constitutionality of the statute at issue in this case." *Id.*

## CONCLUSION

This Court should deny the defendant's motion to dismiss the indictment.

Respectfully submitted,

JAIME ESPARZA
UNITED STATES ATTORNEY


By:    *Stanley M. Serwatka*
       STANLEY M. SERWATKA
       Assistant U.S. Attorney
       Texas Bar #18038400
       700 E. San Antonio, Suite 200
       El Paso, Texas 79901
       (915) 534-6884

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on the March 15, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following participant:

Denise E. Butterworth,
Attorney for Defendant

_____/s/_____
Stanley M. Serwatka
Assistant U.S. Attorney
