IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, § § | |
| Plaintiff, § § | |
| v. § § | Cause No. EP-22-CR-0773-DB |
| ADRIAN GIL, II, § § | |
| Defendant. § | |

## GOVERNMENT'S SUPPLEMENTAL BRIEF

The government respectfully submits this brief in response to this Court's Scheduling Order of June 24, 2024, ECF 71.

### I.
### Case Status

Defendant, Adrian Gil, II (Gil) was indicted on June 16, 2022, for being a known user of illicit drugs in possession of a firearm, in violation of 18 U.S.C. § 922(g)(3). On November 10, 2022, Gil entered a plea of guilty. Gil filed a motion to withdraw his guilty plea and to dismiss the Indictment against him on February 26, 2023, based on a facial and an as-applied challenge to 18 U.S.C. § 922(g)(3), relying on *United States v. Rahimi,* 61 F. 4th 443 (5th Cir. 2023), *cert. granted*, 143 S.Ct. 2688 (2023) and *New York State Rifle & Pistol Ass'n, Inc. v.* Bruen, 597 U.S. 1 (2023). On July 5, 2023, analyzing only the facial challenge this Court denied his motion. Gil was sentenced to 35 months incarceration and three years of supervised release on July 19, 2023. Gil was allowed to remain on bond pending his appeal.

On July 21, 2023, Gil appealed based on the unconstitutionality of § 922(g)(3). The Fifth Circuit vacated and remanded for this Court to reconsider the as-applied challenge considering their decision in *United States v. Daniel*, 77 F.4th 337 (5th Cir. 2023) *cert. granted* ____ S.Ct. ___,

2024 WL 3259662, which had not yet been decided when this Court ruled on Gil's motion to dismiss. The Supreme Court in granting *certiorari* in *Daniels*, vacated the judgement and remanded to the Fifth Circuit for further consideration in light of their opinion in *United States v. Rahimi*, 602 U.S. ____ (2024), 24 WL 3259662.

## II.
## Gil's Background

Gil has a history replete with intoxication, drugs and guns. At age 14, he began using marijuana and after high school became a daily user. ECF 57, pg. 20. He began drinking alcohol at age 15 and by age 20 was drinking between four to eight beers daily. He admits to a dependency to marijuana and alcohol. ECF 36, pg.15, ¶ 56. Gil explained his mind was "like the mind of any addict." ECF 33-6, pg.5. He sold marijuana and was known to carry a firearm. ECF No. 36, pg. 6, ¶ 10.

At age 20, Gil was driving with a blood-alcohol content of .115% when he was stopped for speeding and failed a sobriety test. He had with him a .40-caliber handgun, a magazine with 9 bullets, and marijuana. He pleaded guilty in state court to driving while intoxicated and unlawfully carrying a weapon. He was sentenced to probation. ECF 36 pg.10, ¶ 35.

A few months later, Gil was stopped for speeding again. This time, an officer smelled marijuana, and Gil handed the officer a bag containing some. Gil also had cocaine, a semiautomatic rifle, and a box of ammunition. He pleaded guilty to cocaine possession and was again sentenced to probation. ECF 36 pg. 10, ¶ 37.

Gil was still on probation when a firearm-related disturbance over a drug debt drew police to the residence where he was selling marijuana. ECF 36 pgs.4, 6, 9-11. Officers found a loaded .45-caliber pistol on the hood of a nearby pickup truck and saw several large, vacuum-sealed bags of marijuana in the residence. ECF 36, pg. 4.

A full search of the residence uncovered:

- a 9-milimeter handgun with a 25-round magazine underneath couch cushions in the living room;

- a .357 revolver with rounds in the chamber in the living room;

- a .40-caliber rifle and a magazine with 30 rounds in one of the bedrooms;

- another .40-caliber rifle, this one loaded with 12 rounds, behind the closet in that bedroom; and

- a Glock .40-caliber handgun inside an armrest in a sofa.

ECF 36, pgs. 4-5. The last handgun was mounted with a "Glock switch," a device that converted it from a semiautomatic pistol into a machine gun capable of full automatic fire. ECF pg. 7, ¶ 13. Gil admitted that all the firearms were his. ECF 57 ECF 36, pg. 6, ¶ 11. Officers also found a ballistic vest with plates and more drugs and paraphernalia: several pounds of marijuana; Indica gummies; THC cartridges; THC wax jars; suspected steroids; packaging material with marijuana residue; a digital scale; a grinder; bongs; glass pipes; and a gas mask. ECF 36, pg.5-6, ¶ 7.

## III.
## Argument
## Standard of Review for Motion to Dismiss Indictment

Federal Rule of Criminal Procedure 12 allows a party to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Under this rule, a defendant may allege pretrial that there is "a defect in the indictment," such as "failure to state an offense." Fed R. Crim. P. 12(b)(3)(B)(v). The propriety of granting a motion to dismiss an indictment … by pretrial motion is by-and-large contingent upon whether the infirmity is the prosecution is essentially one of law or involves a determination of fact." *United Staes v. Valencia*, No. 17-CR-882-DAE(1)(2), 2018 WL 6182755, at *2 (W.D. Tex Nov. 27, 2018) (quoting *United States v. Flores*, 404 F.3d 320, 324 (5th Cir.2005). A court may rule on a pretrial motion to dismiss all or part of an indictment when the indictment's alleged

infirmity "is essentially one of law." *United Staes v. Guthrie*, 720 F.App'x 199, 201 (5th Cir. 2018) (quoting *United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011). Motions to dismiss that require a court to weigh evidence are not appropriate for pretrial resolution "because weighing the evidence is the function of the jury." *United States v. Jackson*, No.13-CR-131, 2014 WL 1664901, at *2 (E.D. La. Apr 25, 2014) (citing *United States v. Mann*, 517 F.2d 259, 267 (5th Cir. 1975).

The rule does not permit pre-trial resolution of individualized, offender specific facts. *United States v. Rodriguez-Rivera*, 918 F.3d 32, 35 (1st Cir. 2019); *see also United Staes v. Pope*, 613 F.3d 1255, 1261-63 (10th Cir. 2010) (as-applied Second Amendment challenge could not be considered pretrial where, to prevail, "disputed facts outside the indictment must be found in [defendant's] favor").

## Motion to Dismiss

In his Motion to Dismiss, Gil claimed 922(g)(3) was unconstitutional on its face and as applied to him. In denying Gil's Motion to Dismiss the Indictment, this Court treated Gil's challenge as a facial challenge only because Gil never substantiated his as-applied challenge in his analysis. (Mem. Op. & Order 3 n2, ECF 44). In assessing the facial challenge, this Court held that the Second Amendment 's text covered unlawful drug users (i*d*. at 5-8) but that prohibiting them from possessing firearms is consistent with our historical tradition (*id*. at 8-13.) In reaching the latter conclusion, this Court analyzed categories of historical laws separately and held that intoxication laws did not justify disarmament under Section (g)(3) but that the laws disarming dangerous groups did. (*id*. at 8-13.)

4

**Appellate Review**

On appeal, Gil abandoned his facial challenge and pursued only an as-applied challenge, *United States v. Gil*, NO. 23-50525, 5 n. 4. Although this Court had not considered an as-applied challenge because Gil had not brief one, the Fifth Circuit panel considered an as-applied challenge under *Daniels*, a decision that has since been vacated. *Id*. at 5-10. The Appellate Court Remanded Gil's as-applied challenge to this Court to consider the government's arguments that Section 922(g)(3) is constitutional as applied to Gil. *Id*. at 8-10.

### *Rahimi's* Analytical Framework Governing Second Amendment Challenges

In *Rahimi,* the Supreme Court upheld Section 922(g)(8) under the Second Amendment. The Court explained that "[s]ince the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." 2024 WL 3074728, at *5. Those provisions include surety laws, which authorized magistrates to "require individuals suspected of future misbehavior to post a bond," and going armed laws, which "provided a mechanism for punishing those who had menaced others with firearms." *Id.* at *8-*9. The court concluded that "[t]aken together, the surety and going armed laws confirm" that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at *9. The Court acknowledged that "Section 922(g)(8) is by no means identical to these founding era regimes," but it explained that "it does not need to be": Section 922(g)(8)'s "prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent." *Id.*

In reaching its decision, the Court clarified that its Second Amendment precedents do not demand "a law trapped in amber"; the Second Amendment "permits more than just those regulations identical to ones that could be found in 1791." *Id.* at *6. As Justice Barrett emphasized in concurrence, "imposing a test that demands overly specific analogues has serious problems," including "forc[ing] 21st- century regulations to follow late-18th-century policy choices," and "assum[ing] that founding-era legislatures maximally exercised their power to regulate." *Id.* at *30 (Barrett, J., concurring).

Accordingly, the Court explained that, when assessing whether a law complies with the Second Amendment, courts should consider "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition" by ascertaining "whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Id.* (emphasis added). Under this standard, "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id.* But even "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster,'" so long as the law "comport[s] with the principles underlying the Second Amendment." *Id.*

### Second Amendment as applied to Gil.

As applied to Gil, Section 922(g)(3) is constitutional. Section 922(g)(3)'s application to Gil is consistent with the historical tradition of disarming regular users of marijuana. Gil's drug use presented a heightened risk of harm which our historical tradition allows us to guard against because Gil possessed firearms despite frequent period of intoxication, was dealing with a mental state altered by addiction, and allowed his drug use to create a dangerous situation that came to fruition with a dispute over a drug debt.

Gil, who admitted to daily use of marijuana ECF 57, pg. 29, had drugs and drug paraphernalia in his home, ECF 36, pg. 5. These drugs were alongside nearly a dozen firearms that were openly scattered throughout his home, ECF 36, pg. 4-5.

*Rahimi* supports the government's position that Sections 922(g)(3) is consistent with our "historical tradition of firearm regulation." *NYSRPA v. Bruen,* 597 U.S. 1, 17 (2022); It is consistent with the historically rooted principle that governments may disarm categories of persons whose possession of a firearm would endanger themselves or others. Accordingly, an unlawful user of controlled substances may be temporarily disarmed so long as he misuses illegal drugs.

Three longstanding regimes support the government's authority to disarm those whose unlawful use of illegal intoxicants presents a heightened risk of harm to themselves or others: historical laws regulating firearm possession and use by those under the influence of alcohol, historical practices disarming categories of individuals whose firearm possession presented a special danger to themselves or others, and historical restrictions on firearm possession by the mentally ill. *Rahimi,* 2024 WL 3074728, at *5 (explaining that at the founding legislatures adopted a "rang[e]" of regulations, including restrictions on gun use by drunken New Year's Eve revelers"), *United States v. Harris,* No. 21-3031 (3d Cir. filed Nov. 15, 2023) (discussing restrictions on the mentally ill in more detail). "Taken together," these regulatory regimes and historical restrictions are "relevantly similar" to Sections 922(g)(3), *Rahimi,* 2024 WL 3074728, at *9. They impose a similar restriction: a temporary ban on firearm possession by individuals during periods when they present a special risk of harm to themselves and others. And they do so for the similar reason that firearms present a unique danger when in proximity to intoxicants. *See Smith v. United States,* 508 U.S. 223, 240 (1993) ("[D]rugs and guns are a dangerous

combination."). Gil falls into this category as he was found to be intoxicated while driving and in possession of a firearm, ECF 36, pg. 10. ¶ 35.

It does not matter that Section 922(g)(3) is not "identical to these founding era regimes," because it "do [] not need to be." *Rahimi,* 2024 WL 3074728, at *9. Their temporary prohibition on the possession of firearms by, unlawful drug users fits neatly within the tradition of keeping firearms out of the hands of the intoxicated, those who threaten others, and the mentally ill. *See ibid.*

The Founding generation recognized that those who regularly became intoxicated threatened the social and political order. *See, e.g.*, Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits Upon the Human Body and Mind* 6 (1812) (describing drunkenness as a "temporary fit of madness"). A 1658 Massachusetts law, for example, allowed constables to apprehend those "overtaken with drink" and keep them "in close custody" until brought before a magistrate. *The Charters & General Laws of the Colony and Province of Massachusetts Bay* 82 (1814). Founding-era legislatures also adopted specific measures to separate firearms and alcohol, including regulating firearm use by individuals deemed likely to become intoxicated. A 1655 Virginia law prohibited "shoot[ing] any guns at drinking [events]," regardless of whether attendees became intoxicated. William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* 401-02 (1823). A 1771 New York law similarly barred firing guns during the New Year's holiday, a restriction that "was aimed at preventing the 'great Damages . . . frequently done on [those days] by persons . . . being often intoxicated with Liquor." *Heller*, 554 U.S. at 632 (quoting 5 *Colonial Laws of New York* 244-46 (1894)). And a 1731 Rhode Island law forbade firing guns or pistols in any tavern at night. *See Acts & Laws of the English Colony of Rhode-Island & Providence-Plantations* 120 (Hall, 1767).

Militia laws from the 1700s likewise reflect early legislatures' judgments about the dangers of allowing intoxicated individuals to carry firearms. New Jersey, Pennsylvania, and South Carolina disarmed or authorized the confinement of intoxicated militia members. *See* 2 Arthur Vollmer, U.S. Selective Serv. Sys., *Military Obligation: The American Tradition*, pt. 8, New Jersey, at 25-26 (1947) (1746 law disarming those who appeared "in [a]rms disguised in [l]iquor"); *id.* pt. 11, Pennsylvania, at 97 (1780 law disarming those "found drunk"); *id.* pt. 13, South Carolina, at 96 (1782 law allowing officers to be cashiered or "confined till sober"). Similar laws persisted into the 1800s, *see, e.g.*, James Dunlop, *The General Laws of Pennsylvania* 405-06 (2d ed. 1849) (1822 law)—by which time at least three states outright excluded "common drunkards" from the militia, *see* 1844 R.I. Pub. Laws 503; 1837 Me. Laws 424; 1837 Mass. Acts 273.

During the 19th century, as social norms surrounding, and attitudes about, alcohol changed, and as firearms became less cumbersome, *see, e.g.*, Randolph Roth, *"Why Guns Are and Are Not the Problem,"* in Jennifer Tucker, *et al.*, *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 116-17 (2019); Mark Edward Lender & James Kirby Martin, *Drinking in America: A History* 14-16 (1987), limits (including criminal penalties) on the carry, use, and receipt of firearms or pistols by intoxicated individuals proliferated to cover the general public. Lender, *Drinking in America*, at 45-46. Multiple states passed laws prohibiting members of the general public from carrying firearms while drunk. *See, e.g.*, 1867 Kan. Sess. Laws 25 (prohibiting those "under the influence of intoxicating drink" from carrying a pistol or other deadly weapon); 1878 Miss. Laws 175-76 (prohibiting selling weapons to a "person intoxicated"); Mo. Rev. Stat. § 1274 (1879) (prohibiting carrying "any kind of firearms" "when intoxicated or under the influence of intoxicating drinks"); 1883 Wis. Sess. Laws 290 (prohibiting person in "state of intoxication" from going "armed with any pistol or revolver"); 1909 Idaho Sess. Laws 6

9

(prohibiting "hav[ing] or carry[ing]" any "deadly or dangerous weapon" when "intoxicated, or under the influence of intoxicating drinks"). Such statutes were considered "in perfect harmony with the constitution" and "a reasonable regulation of the use of such arms" even where state constitutions were understood to secure an individual's right to bear arms. *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886).

These historical laws show a clear and longstanding tradition of limiting firearm possession and use during periods of intoxication—when people are least likely to use firearms responsibly. And they support modern-day application of Section 922(g)(3) to do the same. At a minimum, these laws support disarming illegal drug users who pose a threat to the safety of others..

English common law established the government's authority to disarm those who posed a threat to the safety of others. The Statute of Northampton codified the common-law prohibition on "go[ing] armed to terrify the King's subjects." *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K.B. 1686); Statute of Northampton, 2 Edw. 3, c.3 (1328). The Militia Act of 1662 later authorized crown officers to seize the arms of those "judge[d] dangerous to the Peace of the Kingdom.'" 13 & 14 Car. 2, c.3, § 13 (1662). The 1689 English Bill of Rights declared subjects' right to possess arms, but limited the right to Protestant subjects, 1 W. & M. c.2, § 6, and did not purport to repeal the Militia Act, which was employed into the 18th century, *see, e.g.*, *Calendar of State Papers, Domestic: William III, 1700-1702*, at 233-34 (Edward Bateson ed., 1937). Before, contemporaneous with, and after the Bill of Rights' enactment, Parliament also enacted statues disarming Catholics in England and Ireland. 3 Jac. I, c.5, §§ 16-18 (1605-06); 1 W. & M. c.15, §§ 3-4 (1688); 7 Will. III c.5 (1695) (Ireland). And in the early 1700s, statutes disarmed Scottish individuals believed to be loyal to James II. *See, e.g.*, 1 George I, c.54 (1715); 11 George I, c.26 (1724); 19 George II, ch. 39 (1746).

The tradition continued in early American legislatures. Some laws disarmed those who carried arms in a manner that spread fear or terror. *See* 1692-1694 Mass. Acts 11-12; 1696-1701 N.H. Laws 15. Others disarmed entire groups deemed dangerous or untrustworthy, including those who refused to swear allegiance to the colony[1] or the Revolution's cause.[2] Precursors to the Second Amendment proposed in state ratifying conventions likewise confirmed that legislatures may disarm certain categories of individuals, including for "real danger of public injury." Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) (discussing Pennsylvania proposal). Accordingly, as one early scholar wrote, the government may restrict a person's right to carry firearms when there is "just reason to fear that he purposes to make an unlawful use of them." William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829). That understanding persisted after the Civil War. In 1866, for example, a federal Reconstruction order applicable to South Carolina provided that, although the "rights of all loyal and well-disposed inhabitants to bear arms will not be infringed," "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. 908-09 (1866).

These historical sources "support the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous," *Kanter v. Barr*, 919 F.3d 437, 464 (7th Cir. 2019) (Barrett, J., dissenting), including unlawful users of illegal drugs during periods of active use. The reasons are clear: common sense establishes a clear link between drug use and dangerous firearm misuse. For example, drug users may mishandle firearms—or use firearms to commit crimes—because of "drug-induced changes in physiological functions, cognitive ability,

---

[1] *Records of Governor & Company of the Massachusetts Bay in New England* 211-12 (Nathaniel B. Shurtleff ed., 1853) (1637 order disarming Anne Hutchinson's followers).
[2] *See, e.g.*, 4 *Journals of the Continental Congress* 201-06 (1906) (1776 resolution); 1775-1776 Mass. Acts 479; 1777 Pa. Laws 63; 1777 N.C. Sess. Laws 231; 1776-1777 N.J. Laws 90; 9 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* 281-83 (1821) (1777 Va. law); 15 *The Public Records of the Colony of Connecticut from May, 1775, to June, 1776, Inclusive* 193 (Charles J. Hoadly ed., 1890) (1775 law).

11

and mood." *Harmelin v. Michigan*, 501 U.S. 957, 1002 (1991) (Kennedy, J., concurring in part and concurring in the judgment); *see Florence v. Board of Chosen Freeholders*, 566 U.S. 318, 332 (2012) ("The use of drugs can embolden [individuals] in aggression."). Illegal drug users may also use firearms to "commit crime in order to obtain money to buy drugs," *Harmelin*, 501 U.S. at 1002 (Kennedy, J., concurring in part and concurring in the judgment), or to commit "violent crime" that "may occur as part of the drug business or culture," *id*. And because of the *unlawful* nature of their activities, armed drug users are more likely to have dangerous confrontations with law enforcement officers. *United States v. Carter*, 750 F.3d 462, 469 (4th Cir. 2014). It thus is no surprise that judges have observed that "drug dealing" is "dangerous because [it] often lead[s] to violence." *See, e.g.*, *Folajtar v. Att'y Gen.*, 980 F.3d 897, 922 (3d Cir. 2020) (Bibas, J., dissenting).

### Facial Challenge Precluded

Gil cannot now make a facial challenge for two reasons. First, the law of the case and its corollary the mandate rule foreclose a facial challenge because Gil did not dispute this Court's rejection of his facial challenge on appeal, *see* slip. op. 5 n. 4, and the appeals court remanded only for consideration of an as applied challenge, *id.* at 10. *See, e.g., United States v. Hernandez*, 48 F.4th 367, 371 (5th Cir. 2022). Second, *Rahimi* makes clear the high standard for a facial challenge. A court assessing a facial challenge should not imagine scenarios in which it thinks a statute could be unconstitutionally applied. Rather, a defendant raising a facial challenge must show that the statute would be unconstitutional in every application.

As the Supreme Court explained, when a defendant presses a facial challenge, the question is not whether the challenged regulation "might raise constitutional concerns" in some "hypothetical scenarios." *Rahimi,* 2024 WL 3074728, at *6. Rather, the question is whether the defendant has "establish[ed] that no set of circumstances exists under which the Act would be

valid." *Id.* (quoting *United States* v. *Salerno,* 481 U.S. 739, 745 (1987)). Sections 922(g)(3) is undoubtedly constitutional in at least *some* of its applications.

## Conclusion

For the reasons stated herein, the government respectfully submits that an as applied challenge requiring the dismissal of the indictment against Gil, be in all things denied.

Respectfully submitted,

JAIME ESPARZA
UNITED STATES ATTORNEY

By: *Stanley M. Serwatka*
STANLEY M. SERWATKA
Assistant U.S. Attorney
Texas Bar #18038400
700 E. San Antonio, Suite 200
El Paso, Texas 79901
(915) 534-6884

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 22, 2024, a true and correct copy of the foregoing instrument was electronically filed with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

Matthew DeKoatz,
Attorney for Defendant

*Stanley M. Serwatka*
STANLEY M. SERWATKA
Assistant United States Attorney